Jonathan S. Massey (#457593)
Bret R. Vallacher (#90014327)
Kylie Chiseul Kim (#230277)
Jeremy G. Mallory (#1025814)
Matthew E. Layden (#90025915)
**MASSEY & GAIL LLP**
1000 Maine Avenue SW, Suite 450
Washington, D.C. 20024
Tel: 202-652-4511
Fax: 312-379-0467
jmassey@masseygail.com
bvallacher@masseygail.com
kkim@masseygail.com
jmallory@masseygail.com
mlayden@masseygail.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| Media Rights Technologies, Inc., and Hank Risan, <br><br> Plaintiffs, <br><br> v. <br><br> Microsoft Corp., <br><br> Defendant. | Case No. 1:24-cv-03441 <br><br> **COMPLAINT FOR COPYRIGHT INFRINGEMENT; CIRCUMVENTION OF COPYRIGHT PROTECTIONS; ALTERATION OF COPYRIGHT MANAGEMENT INFORMATION; TRAFFICKING IN ILLICIT LABELS; THEFT OF TRADE SECRETS; VIOLATION OF UNFAIR COMPETITION LAW; VIOLATION OF DMCA TAKEDOWN ORDER; DECLARATORY JUDGMENT OF COPYRIGHT INVALIDITY** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Media Rights Technologies, Inc. ("MRT") and Hank Risan ("Risan") (collectively, "Plaintiffs") file this Complaint against Defendant Microsoft Corp. ("Microsoft" or "Defendant"), and allege the following:

## INTRODUCTION

1.      In 2002, MRT, a small software developer invented a ground-breaking digital rights management ("DRM") software called the Controlled Data Pathway ("CDP").  DRM software is a set of tools that control access to copyrighted digital content, such as software, media, and hardware.  It is used to prevent piracy and to allow audio and video files to be shared, apps to be updated, and cloud computing to operate securely.  MRT's technology solved the fundamental issues of protecting access to, and securing transfers of, data stored within a computer in a cloud network.  MRT obtained multiple patents for CDP (the "Risan Patent Family") and embedded a unique digital "Watermark" and "Fingerprint" in the source code to help identify unlawful copying.  MRT also registered numerous copyrights for its works over the years.

2.      Key industry players—including the Recording Industry Association of America ("RIAA") and the Motion Picture Association of America ("MPAA")—found the CDP to be **100% effective** at preventing unauthorized copying of media files, which was a feat that even software mega-giants like Microsoft had not been able to accomplish.  At the time, Microsoft's solution was completely ineffective.

3.      The RIAA and MPAA arranged an introduction between MRT and Microsoft and encouraged Microsoft to obtain a license to MRT's technology.  Microsoft was sufficiently impressed that it offered to buy 51% of MRT for $50 million (the maximum sum that could be offered before an antitrust review would be triggered under the Hart-Scott-Rodino Act).  During negotiations and subject to a non-disclosure agreement ("NDA"), Microsoft received user accounts

from an MRT subsidiary (called BlueBeat.com) to review the CDP object code software, and MRT provided information about the CDP technology and patents.  Understanding the value of its technology, MRT rejected Microsoft's offer as too low.

4.    Rather than increase its offer, license MRT's code, or develop its own, Microsoft instead decided to simply incorporate MRT's source code into first Windows Vista, then other Windows operating systems, and finally many other Microsoft products.  Microsoft claimed the code as its own, which it called the Protected Media Pathway ("PMP").  Microsoft had the means (immense resources), motive (it had failed to develop its own solution to the problem of unauthorized copying of media files and purchase of a third-party company with a solution to the problem would have triggered an antitrust review under the Hart-Scott-Rodino Act), and opportunity (access to MRT's technology).

5.    MRT has evidence that a former MRT employee, Liz Crowell ("Crowell"), misappropriated MRT source code and other confidential business information and trade secrets and provided them to Microsoft – enabling Microsoft to use MRT's technology in a wide range of products without its permission.  This also destroyed MRT's ability to market that same code to others.  Crowell served as MRT's Business Development Director and Document Control Manager until she left the company in or about 2007.

6.    When Microsoft filed a patent application for the PMP, the U.S. Patent and Trademark Office ("USPTO") twice rejected Microsoft's application on the ground that it was anticipated by a prior MRT patent application (which was an unpublished trade secret at the time of Microsoft's PMP application).  The Patent Examiner determined that every element of the claims in the Microsoft PMP application had been previously invented by MRT.  Microsoft tried to hide the infringement by citing 971 prior art citations but not the MRT patent application.

7.    In 2012, Microsoft was given access to execute a demonstration version of MRT's CDP object code as well as snippets of key patent enabling software source code prior to an MRT patent auction held by Bank of America Merrill Lynch.  The opening bidding price for the CDP patents was $7-10 billion.  Prior to the auction, Microsoft was granted NDA-restricted access to over 25,000 confidential MRT documents regarding its intellectual property.  MRT took extra care to protect its trade secrets using a monitoring administrator, strong passwords, encryption, and an End User License Agreement ("<u>EULA</u>") providing limited access to that highly confidential and proprietary information from a secure data room.  Microsoft ultimately did not make an offer to purchase or license MRT's intellectual property, but it improperly gained access to, and misappropriated, MRT's confidential information and trade secrets.

8.    Since then and through the present day, Microsoft has included MRT's copyrighted property and trade secrets in **billions** of copies of products in violation of MRT's legal rights. Microsoft's infringing products range from media players to operating systems (Windows XP Service Pack 3, Windows Vista, Windows 7, Windows 8, Windows 10, Windows 11, and the Media Foundation Update to Windows N for the European Union).  The offending Microsoft code is embedded in virtually every Microsoft product, including the Azure Intelligent Cloud, PlayReady, Xbox, and Office 365.  For example, the CDP is used as an administrator to securely purchase Microsoft Office 365, manage Office 365 software updates and renewals, securely distribute Office 365 to a user's computer, and securely manage Office 365 document creation, storage, and rights for distribution to other users as well as Azure RMS - 2022, and Office 365 - 2022.  It is also used to deliver Media Content on Spotify, Amazon, Netflix, and countless other PlayReady customers.

9.      As a result, Plaintiffs have suffered substantial economic damages and are entitled to relief against Microsoft.

10.     On April 25, 2013, MRT filed a patent infringement action against Microsoft.  One of MRT's patents was invalidated on unrelated grounds during a separate lawsuit with Capital One in 2014.  In April 2016, MRT dismissed its patent infringement action against Microsoft.

11.     In 2017, MRT sued Microsoft for copyright infringement and other claims.  The Ninth Circuit held that certain claims asserted by MRT were precluded by its previous dismissal of the patent claims, but that other claims were not precluded.  In particular, "under the separate-accrual rule, any sales of allegedly infringing Microsoft products after April 25, 2013, gave rise to a cause of action (the 'post-filing copyright infringement claims') as of the date of the sale—i.e., at some point after April 25, 2013." *Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1024 (9th Cir. 2019).  The court of appeals explained that "the separate-accrual rule means that a new cause of action for copyright infringement accrued each time Microsoft sold an allegedly infringing product." *Id.* at 1023.

## NATURE OF THE ACTION

12.     This is a civil action against Microsoft for damages, injunctive relief, attorneys' fees and costs, and other appropriate relief based on the following causes of action:

  a.  copyright infringement arising under the Copyright Laws of the United States (17 U.S.C. § 501, *et seq)*;

  b.  circumvention of copyright protections (17 U.S.C. § 1201);

  c.  alteration of copyright management information (17 U.S.C. § 1202);

  d.  trafficking in illicit labels (18 U.S.C. § 2318);

  e.  theft of trade secrets (18 U.S.C. § 1832 and state law);

f.   violation of state unfair competition law;

g.   violation of DMCA takedown order (17 U.S.C. § 512);

h.   declaratory judgment of invalidity of infringing Microsoft copyrights (28 U.S.C. § 2201).

## THE PARTIES

13.   Plaintiff Media Rights Technologies is a corporation organized under the laws of California with a place of business at 515 Washington Street, Santa Cruz, California 95060.

14.   Plaintiff Risan is domiciled in California.

14.    Microsoft is a corporation organized under the laws of Washington with a place of business at One Microsoft Way, Redmond, Washington 98052.  Microsoft has a corporate office in this District located at 901 K Street, N.W., Washington, D.C. 20001.  Microsoft advertises, sells, offers to sell, markets, promotes, and supports products and services infringing MRT's intellectual property rights in this judicial District, and introduces infringing products and services into the stream of commerce knowing that they would be sold and/or used in this judicial District and elsewhere in the United States.

## JURISDICTION AND VENUE

15.   This Court has subject matter jurisdiction over Counts I–V and VII-VIII under 28 U.S.C. §§ 1331, 1338(a), and 1338(b).

16.   This Court has subject matter jurisdiction over Count VI under 28 U.S.C. § 1367.

17.   Additionally, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

18.   This Court has personal jurisdiction over Microsoft because Microsoft has substantial, continuous, and systematic contacts with this District, including by regularly transacting business within the District.  In addition, Microsoft has purposefully directed its activities toward, and consummated transactions within, this forum and has purposefully availed

6

itself of the privilege of conducting activities in this forum, thereby invoking the benefits and protections of its laws.

19.    The acts complained of herein arise out of and relate to Microsoft's forum-related activities, making this Court's exercise of jurisdiction over Microsoft reasonable.

20.    Venue is proper in this judicial District under 28 U.S.C. § 1400(a) because Microsoft may be found within this District and under § 1391(b) because a substantial part of the wrongful conduct alleged herein occurred in this District. For example, Microsoft maintains an office at 901 K Street, N.W., Washington, D.C. 20001, which facilitates the sale of the accused products in this District.  The Copyright Office is located in Washington, D.C.  Key witnesses are subject to the jurisdiction of this Court.

21.    Microsoft sells a substantial number of the accused products to the Federal Government.  In fact, Microsoft is supplying the Government with infringing software and is effectively defrauding the Government by certifying that its products comply with all applicable laws.

22.    This Court has personal jurisdiction over Microsoft because of Microsoft's substantial business in this forum, including selling products and conducting business, and because Microsoft intended to cause harm to Plaintiffs in this forum.

## **FACTUAL ALLEGATIONS**

*MRT Develops, Patents, and Implements a Successful Software Solution to Internet Media Piracy*

23.    In or around 1998, Hank Risan founded the Museum of Musical Instruments ("MoMI").  As part of its exhibitions, MoMI, through an associated website, became one of the first websites to broadcast audio-visual works pursuant to 17 U.S.C. §§ 112 & 114.  Within two years, MoMI's website had received over four billion hits.  MoMI obtained experimental

interactive online publishing licenses from ASCAP, BMI, and SESAC, necessitating some form of protection to prevent unauthorized copying of copyrighted audio-visual works.

24.    This problem was not unique to MoMI.  In the early 2000s, one of the greatest factors holding back the music and video streaming industry was the issue of "stream ripping" – the process of digitally capturing an audio or video file.  In the process of digital capture, copyright management software is removed, making stream ripping ideal for digital piracy of streaming music and movies in violation of copyright law.  Both the music and movie industries were keenly aware of the challenges stream ripping posed from their prior experience with companies such as Napster and knew streaming would not be economically viable until the problems could be resolved.  Every company in the industry, including Microsoft, attempted to develop its own solution: a video and audio Digital Rights Management tool which could defeat the multiple "cracking" software tools which were available.  All attempts to solve the problem failed.

25.    In or around 2001, Risan and others founded Music Public Broadcasting System ("MPBS") to develop security technologies to protect intellectual property in digital media.  MPBS developed its own intellectual property to support the e-commerce, entertainment, finance, defense, education, and healthcare sectors.  In 2004, MPBS changed its name to Media Rights Technologies, Inc., or MRT.  To avoid confusion, MPBS and MRT will both be referred to as "MRT" herein.

26.    Risan, the founder of MRT, developed solutions for protecting streaming content.  Risan had studied topology and network theory as applied to computers at University of California – Santa Cruz, University of California – Berkeley, and Cambridge University, England at the Ph.D level and had been writing software to address digital piracy since the late 1990s.  His educational

background was ideal for approaching and solving the problem.  Mr. Risan called his programs SeCure, and he authored most of the SeCure copyrights.

27.     In early June 2002, MRT began software production on its SeCure Player for Windows.  Six weeks later, in July 2002, MRT had a working prototype of the Controlled Datapath Software ("CDP").  By November 2002, MRT had enabled a production version of the CDP, written entirely in software for Windows XP.  (Windows XP was launched on October 25, 2002, to the public.  It had an enhanced multimedia system and would provide a 95% Operating System Market Share for Microsoft.)  In late November 2002, MRT filed a patent application entitled "Controlling Interaction of Electronic Media" with the USPTO.

28.     Each CDP software source code module contained Copyright Management Information ("CMI") including Title, Author, comments and date and time for when the module was added to the CDP software.  Most of these time stamps reflect summer 2002 as the date of creation.  Over the years, over 100 variations of the CDP were created.  The software expression of CDP technology created by Risan and MRT has gone by various names including X1 Recording Control ("X1RC") and BlueBeat Secure Player.  The software was used to form the basis for enablement of over 50 patents filed worldwide.

29.     Because the specifications of the CDP patents contain critical X1RC source code snippets that would be available to the public, MRT inserted a known piece of obscure code elsewhere that would enable detection of any copying—a digital Watermark. The Watermark is detectable in human-readable object code compiled from computer-readable source code containing the Watermark.  MRT included the Watermark in the IsRecorderPresent source code, which performs application layer and kernel streaming media player detection using the CDP.

MRT dubbed it the "Bad Boy" because it contained a list of unauthorized recording applications that, if detected, would be blocked by the CDP.

30.     In 2002, MRT developed a secure web-based music service, bluebeat.com ("BlueBeat").  BlueBeat was an early internet music broadcast service licensed under 17 U.S.C. §§ 112 & 114, licensed by over 60,000 composers.  BlueBeat, Inc., was separately incorporated as a wholly owned subsidiary of MRT in 2003.

31.     Audio-visuals downloaded from BlueBeat could only be played on a copy of the Microsoft Windows Media Player ("WMP") that had incorporated X1RC and other MRT software. The combination was called the BlueBeat SeCure Player ("BBSP").  In sum, the BBSP was an application designed to prevent content piracy for media downloaded from BlueBeat on computers using Microsoft operating systems.

32.     The BBSP specifically incorporates the X1RC technology, including anti-circumvention and anti-reverse-engineering protective measures, including, but not limited to, encryption and strong passwords.

33.     Around the same time, Microsoft was developing what it called the Secure Audio Path ("SAP"), which also aimed to provide a secure networked streaming environment for Windows.  In late 2002, the RIAA and MPAA deemed the SAP ineffective at mitigating piracy. Around 2005, Microsoft announced that it had abandoned SAP.

*MRT Impresses the Music and Film Industries*

34.     In January 2003 MRT demonstrated its software to both the RIAA and the International Federation of the Phonographic Industry ("IFPI"), the parent organization for all record labels, in London, and submitted it to the RIAA for testing.  The RIAA's 2003 report stated: "It appears from the demonstrations carried out by [MRT] for RIAA" that its invention "is an

effective technology that solves a prevalent method of attacking secured content" and "appears to defeat a whole class of circumvention tools."  It concluded that MRT "has come up with a technology that seems to overcome a widespread class of audio recording tools used to circumvent technical measures.  [Its technology] appears to address a limitation in the extent to which many known DRMs provide complete protection." The same report also stated that the proposed solution by Microsoft was ineffective.

35.     The RIAA report was initially circulated within all the members of the recording industry, but, on information and belief, the RIAA also circulated the report to Microsoft and other computer industry companies in or around July 2003. On information and belief, the RIAA and IFPI recommended at that time that Microsoft deploy the MRT CDP piracy solution.

36.     Over 100 content creators and distributors including MPAA and movie and TV studios reviewed the CDP under NDAs.  The MPAA also tested MRT's piracy solution around the same time, found it to be effective at preventing piracy of video content from a computer, and recommended that Microsoft deploy it.

37.     In a 2003 meeting, Brad Hunt, the MPAA Chief Technology Officer ("CTO"), told MRT that he wanted a Microsoft solution using MRT's CDP, and with MRT's permission he made the contact with Microsoft to move forward.  So too did Steve Marks, the RIAA general counsel. In June 2003, Marks provided Microsoft with the RIAA report and contacted Microsoft with MRT's express consent to arrange a direct meeting between MRT and Microsoft.  MRT's first contact with Microsoft was in November 2003 with David Vaskevitch, Microsoft's CTO. Discussions continued thereafter.

*Microsoft Unlawfully Copies MRT's Intellectual Property*

38.    In July 2003, pursuant to an NDA, Microsoft was provided with a copy of the confidential RIAA report as well as an object code demonstration version of CDP.

39.    On or about August 28, 2003, Vaskevitch contacted MRT by email regarding the CDP and the X1RC software.  Vaskevitch reported to Chief Software Architect, and Microsoft Chairman, Bill Gates at this time.

40.    Vaskevitch was provided with a BlueBeat user account and a key for downloading and testing BBSP.  The BBSP version that Microsoft downloaded had an EULA that prohibited reverse engineering and copying.  Microsoft was also provided with documentation for how BBSP used CDP to prevent piracy.

41.    Liz Crowell—MRT's recently hired Business Development Director and Document Control Manager— spoke with Vaskevitch on MRT's behalf in late 2003.  She was a long-time personal friend with Vaskevitch.  She had secure, controlled access to the archived MRT patent files, software embodiments, and related IP documents.

42.    Prior to the conversation with Vaskevitch, Crowell spoke with MRT patent counsel, who advised her not to disclose any trade secret material including patent manuscripts and embodiment software.  MRT also instructed her not to disclose any such information.

43.    Crowell maintained all undisclosed patents and trade secrets in locked file cabinets in her locked office.  Only MRT's CEO and COO had office keys in addition to Crowell.  Only Crowell had file cabinet keys.

44.    Crowell was responsible for distributing all object code builds sent to studios and record labels, which were sent pursuant to NDAs and licenses.

45.    She had access to copies of the patent enablement source code software, as well as the associated patent enablement object code, all stored inside the archived patent cabinet, but was not authorized to send this material to anyone.  She had no authorized access to the Build Computer, which contained over 90,000 files for BlueBeat production software builds showing proof of MRT patent enablements.  Included were detailed assembly instructions for the builds, including how to make different versions of the CDP and other software.

46.    Crowell nagged the MRT Chief Technology Officer for months to update the Trade Secret Notebook under her control, which he did.  The CTO showed Crowell the location of the Build Computer, which was password protected, but refused to give her the password.

47.    Crowell asked MRT CDP engineer Janet Brambaugh for the password to Build Computer.  Brambaugh was one of three MRT employees to have the password.  On information and belief, Brambaugh gave the password to Crowell, which would have given access to all MRT source and object code and builds.  Brambaugh gave Crowell the password because Crowell insisted she needed it to send a build to a potential licensor.

48.    In late 2003, Crowell took the folder for the as-yet unpublished MoMI-018/'033 SeCure Cloud Patent, which included the full specifications, detailed drawings, diagrams, charts, and software embodiments.  MoMI-018 describes the Secure Cloud as it is used today.  Crowell also took at least four other related folders from a file cabinet to which only she possessed keys. The file cabinet also contained encrypted DVD copies of patent enablement source and object code software for which she had the password.

49.    On information and belief, Crowell also surreptitiously obtained access to the Build Computer at some point in 2004, giving her access to all MRT source and object code.

50.     In addition, MRT discovered (after Crowell left the company in or about 2007) that the aforementioned Trade Secret Notebook and a notebook of unpublished patent claims had both disappeared from a locked desk drawer to which only Crowell had a key.  She also took the only key.

51.     MRT filed a police report regarding the theft of the notebook of trade secrets and the notebook of unpublished patent claims.  MRT called in a locksmith to get into Crowell's locked desk drawer and archive file after Crowell left.

52.     Crowell deleted all her email files, including all correspondence with Microsoft. She refused to respond to an email asking directly about her contacts with Microsoft.  She refused to re-sign an NDA even though she had invested approximately $1 million in MRT.   She abandoned approximately $1 million in MRT shares without notifying MRT.

53.     On information and belief, the confidential files were taken for a meeting or meetings with Microsoft, as early as December 2003 and occurring from time to time thereafter, providing Microsoft with illegal early access not only to MRT's concepts and ideas, but also how those are embodied and expressed in specific source and object code.  MRT believes that Crowell unlawfully provided MRT's trade secret intellectual property directly to Microsoft.

54.     Further, in August 2004, MRT provided information about CDP to Microsoft, including the Risan Patent Family.  The information was provided under the protection of a signed non-disclosure agreement (the "2004 NDA") that specifically prohibited reverse engineering, decompiling, or disassembling of MRT products.   Once the 2004 NDA was executed, MRT provided Microsoft with an executable object code copy and EULA of the BBSP and, shortly thereafter, online access to the BBSP.

55.    In the fall of 2004, Microsoft requested, and MRT sent, a prospectus and business plan. In December 2004, Microsoft offered $50 million for a 51% stake in MRT, effectively giving MRT a value of $100 million. The offer was made directly to Risan by Adam Byrne of Microsoft with a witness present. Risan conveyed the offer to MRT's board and to MRT's investment banker, WR Hambrecht + Co.

56.    In 2004, the threshold transaction amount set by the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR") for disclosure to antitrust regulators was $50 million.

57.    On information and belief, Microsoft had a much higher valuation of MRT, but acquiring MRT would have given Microsoft an effective monopoly on DRM technology, so Microsoft low-balled its offer to avoid HSR scrutiny. Crowell threatened to resign unless MRT accepted Microsoft's offer.

58.    In January 2005, MRT declined Microsoft's insufficient offer. Microsoft attempted to persuade MRT to change its mind. In February 2005, MRT again declined the offer.

59.    The U.S. Supreme Court's decision in *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), renewed congressional interest in DRM, including the drafting of legislation that would become the Platform Equality and Remedies for Rights Holders in Music Act of 2007 (the "PERFORM Act"). Between early drafts of the PERFORM Act and *Grokster*, on information and belief, Microsoft saw potential liability to content providers such as the RIAA and MPAA if it did not implement effective piracy solutions in its operating systems. Microsoft's motive for obtaining MRT's 100% effective piracy solution deepened.

60.    In 2005, Microsoft announced that it was working on a DRM solution that it would include in the 2006 version of its Vista software. According to the Microsoft Program Manager for Windows Media Technologies: "The top objective for these mechanisms is to enable the

Windows-based PC to play premium content in 2006 and beyond, offsetting any content-owners fears that high-value content could be pirated if played on a PC. Currently, the PC cannot play some classes of premium content. For example, a PC cannot receive 5C Digital Transmission Content Protection (DTCP) content or playback pay-per-view movies from a cable or satellite provider. An important reason for this is that the content owners don't currently trust the PC enough." ("Output Content Protection and Windows Vista," WinHEC 2005 Version - April 27, 2005).

61.     In April 2005, Microsoft filed a patent application for a "Protected Media Pathway" ("PMP") technology. The patent claims and drawings show that the PMP is a copy of MRT's CDP, as a Patent Examiner subsequently concluded, unbeknownst to MRT. There were no examples of source code embodiment software contained in the PMP patent application file. Thus, it cannot be demonstrated that Microsoft had reduced the invention to practice at the time of the filing of the application.

62.     In March 2006, the RIAA again contacted MRT regarding the X1RC software. The RIAA specifically requested that MRT develop a version of the X1RC software that could prevent piracy on Microsoft's Windows Media Player when downloading from Microsoft servers (the "BBSP for WMP Software"). The BBSP for WMP Software includes the Watermark and Fingerprint, among other intellectual property protections.

63.     In summer of 2006, MRT delivered to RIAA and IFPI the object code for the BBSP for WMP Software, as well as instructions for setting it up on a Windows server such as that used by the Digital Media Association ("DiMA"), of which Microsoft is a member.

64.     On November 8, 2006, RIAA/IFPI demonstrated the BBSP for WMP Software for DiMA, including Microsoft. The demonstration was a complete success—and also gave Microsoft

access to the object code for the BBSP for WMP Software to use on its Windows PlayReady content and license servers through its association with DiMA through a EULA that prohibited copying and reverse engineering. PlayReady was announced in February 2007 and released in June 2008.

65.     In January 2007, Microsoft released the first commercial version of the Vista operating system.  It specifically ***prevented*** the use of the BBSP but included a DRM system that worked virtually identically to X1RC.  MRT later designed a special form of the BBSP that would function with Vista, as a derivative work of the BBSP itself ("BBSP for Vista").  The CDP software, the X1RC software, the BBSP software, the BBSP for WMP Software, the BBSP for Vista software, and the remaining copyrighted MRT software are collectively the "MRT Software."

66.     MRT believed that it had first detected the Watermark inside the Microsoft Media Player in 2014 using Microsoft Visual Studio.  However, MRT experts have been unable to verify that the code surrounding the detected Watermark matched that of the surrounding code in its original module, IsRecorderPresent, due to Microsoft's obfuscation using its proprietary Warbird Obfuscator encryption.

67.     MRT's Fingerprint and CDP declaring code appear in Microsoft products including, but not limited to, Windows XP Service Pack 3, Windows Vista, Windows 7, 8, 10, 11 and a Media Foundation update to Windows N, Windows Media Player 11, Windows Media Player 12, Windows Media Player Software Developers Kit, and PlayReady, and are also dynamically configured into Internet Explorer 8, Internet Explorer 9, Internet Explorer 10, and Internet Explorer 11 and all versions of Edge, upon a successful user request for media content. The Fingerprint is present in the code relating to DRM for those products, and not elsewhere in

the programming.  Additionally, portions of the CDP declaring code are permanently resident in the browsers, Explorer and Edge, to initiate a streaming request for media content.  Tellingly, the Fingerprint is ***not*** present in any Microsoft products published in the eight years prior to the release of these original infringing products.

68.     In 2012, MRT investigated potentially selling the Risan Patent Family through a patent auction.  On or about May 14, 2012, MRT and Microsoft entered into a confidentiality agreement in connection with a possible acquisition of the patent portfolio.  Using a secure data room, Microsoft was given access to a substantial quantity of evaluation information that was confidential and proprietary to MRT, including roughly 25,000 trade secret documents, subject to an NDA.  Microsoft chose not to pursue the transaction.  Nevertheless, MRT believes that Microsoft used the patent auction to improperly gain access to MRT's trade secret intellectual property.

69.     Microsoft implemented "Warbird," a program internal to the operating system that obfuscated Media Foundation, the location of the purloined MRT code.  This may have happened as early as Vista.  Warbird successfully obfuscated much of the code relating to DRM, including the code surrounding the Watermark, preventing anybody from outside Microsoft from fully determining the structure, sequence, or organization of Microsoft's code.  This obfuscation covered up Microsoft's theft of MRT's copyrighted CDP code and constitutes fraudulent concealment.

70.     Warbird also obfuscated the Fingerprint, but as discussed below, in 2022 MRT was eventually able to discover the Fingerprint in Microsoft's infringing products after a reverse-engineering tool, GHIDRA, developed by the National Security Agency became available.

*Prior Litigation Between the Parties*

71.     In April 2013, MRT brought a patent infringement suit against Microsoft.  *Media Rights Techs., Inc. v. Microsoft Corp.*, No. 13-CV-01916 (N.D. Cal.) ("*MRT I*").  MRT alleged that multiple Microsoft products contain the PMP software and therefore infringed on four of MRT's CDP patents: United States Patent No. 7,316,033 (the "'033 patent"), United States Patent No. 7,578,002 (the "'002 patent"), United States Patent No. 7,904,964 (the "'964 patent"), and United States Patent No. 8,132,263 (the "'263 patent").

72.     After one of the MRT patents was found invalid for unrelated reasons in a separate litigation (*Media Rights Techs., Inc. v. Cap. One Fin. Corp.*, 2013 WL 6506176, at *1 (E.D. Va. Dec. 9, 2013), *aff'd*, 800 F.3d 1366 (Fed. Cir. 2015)), MRT voluntarily dismissed its patent infringement suit with prejudice, and instead filed a lawsuit claiming copyright infringement, violation of the Digital Millennium Copyright Act ("DMCA"), and breach of contract—*Media Rights Techs., Inc. v. Microsoft Corp.*, No. 17-CV-01925 (N.D. Cal.) ("*MRT II*").  The district court dismissed the second lawsuit based on claim preclusion, but the Ninth Circuit reversed in part, holding that, while some claims were barred as a result of *MRT I*, the copyright infringement claims arising after the filing of *MRT I* could proceed.  *See Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014 (9th Cir. 2019).  MRT voluntarily dismissed *MRT II* without prejudice.

73.     In 2020, MRT began to examine Microsoft's PMP source code using "GHIDRA," a state-of-the-art open-source reverse engineering tool developed by the National Security Agency and only made publicly available starting in 2019.  GHIDRA allowed MRT to partially unlock Microsoft's proprietary "Warbird" encryption obfuscation system that was hiding stolen MRT code in Microsoft products (evidence to which MRT previously did not have access).  Using reverse engineering of Microsoft object code into source code, MRT engaged in extended

GHIDRA analysis to discover that at least 43,000 lines of MRT source code are embedded in the Microsoft PMP software. This led to the discovery of the MRT Fingerprint in 2022. The infringing code was found in Microsoft's implementing Policy Engine and declaring MFPMP.EXE source code.

74.    A line-by-line expression comparison of more than 1,900 lines of CDP declaring source code (comprising 57 functions) *against* the corresponding Microsoft declaring source code shows that the expression is substantially similar (Microsoft copied all 57 functions), with the main differences being only reformatting and term changes. The Structure, Sequence, and Organization ("SSO") after the Abstraction-Filtration-Comparison Test of the MRT and Microsoft code is a 100 percent match.

75.    There are numerous signs of copying. For example, Microsoft copied the CDP technique of keeping the X1Server implementation code in a separate .exe task container which is not the typical approach taken by Microsoft. Microsoft essentially paraphrased thousands of lines of the CDP code and added additional code to support Application Programming Interfaces ("APIs") to allow for third-party access (by content providers such as Netflix or Spotify, for example). These changes are not exculpatory, transformative, or evidence of independent invention but simply adaptations for special Microsoft needs. Thus, Microsoft used different function names for the MRT code; Microsoft code has added support for an API that can be used by third party developers, making it easier to proliferate throughout the developer community; and Microsoft does not retain MRT's copyright management information and instead has replaced it with its own copyright information. These differences cannot obscure the fundamental copyright infringement.

76.     Further proof of copying is the fact (revealed by MRT's GHIDRA analysis) that the Microsoft code shows the same digital "Fingerprint" that MRT had embedded in its own source code.  Each of the 57 CDP functions was assigned an operating system layer number: 2, 3, or 4. Layer 2 denotes the kernel, Layer 3 is the user mode subsystem, and Layer 4 is the application layer.  Using GHIDRA, MRT discovered that 44 of these 57 points of identification were copied by Microsoft and the layering sequence of the 44 copied functions was exactly the same.  The overall assignment of various function calls to specific operating software layers was a choice made by the implementers of this particular code version.  Other MRT CDP software solutions use different network layer sequences to solve the problem of protecting content.  The only way to discover this Fingerprint was with the GHIDRA reverse engineering suite of tools, to overcome Microsoft's proprietary Warbird Encryption and Obfuscation program.

77.     MRT created the CDP in a nine-step process, in which each step performs a task, such as: authenticate, decrypt, or block media content through a secure pathway in the operating system within a cloud computer network.  Microsoft's PMP mirrors this structure and is divided into nine steps as well.

78.     In short, the GHIDRA analysis shows that the SSO source code expressions of the nine steps match; the functions within each steps match; and 44 out of 57 points of identification in the embedded Fingerprint match.

79.     In addition, in late 2021, MRT learned that in 2008 and 2009, the USPTO had twice rejected Microsoft's patent application for PMP due to similarities with one of MRT's patents, MoMI-018 (which concerns MRT's secure data cloud network and has its own valid copyright registration).  It was this patent that MRT now believes Crowell gave to Microsoft in late 2003. According to the Patent Examiner, all seven PMP embodiments, 20 out of 20 PMP patent claims,

and at least 15 out of 27 architectural diagrams and related detailed descriptions had already been disclosed by MRT's previous patent application.  The examiner stepped through each and every claim of Microsoft's PMP application and showed how it was essentially identical to MRT's MoMI-018 patent (a/k/a "Risan," in the prior art discussions).  In other words, the examiner twice rejected all 20 claims in Microsoft's PMP patent application because it was strikingly similar to MRT's prior unpublished application.  The examiner explained: ***"Claims 1-20 are rejected under U.S.C 102(e) as being anticipated by Risan et al Publication No. 2005/0172121 Al), hereinafter Risan."***  Exhibit A to this Complaint shows how the Patent Examiner identified 28 MRT patent claim components (each a trade secret) misappropriated by Microsoft.

The USPTO Index of Claims clearly shows the rejection history of Microsoft's patent application against MoMI-018:



| *Index of Claims* | | Application/Control No. | | Applicant(s)/Patent Under Reexamination | | |
|---|---|---|---|---|---|---|
| | | 11116689 | | GRIGOROVITCH ET AL. | | |
| | | Examiner | | Art Unit | | |
| | | MONJOUR RAHIM | | 2434 | | |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | + | Restricted | I | Interference | O | Objected |

☐ Claims renumbered in the same order as presented by applicant    ☐ CPA    ☐ T.D.    ☐ R.1.47

| CLAIM | | DATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 10/06/2008 | 03/23/2009 | | | | | | |
| | 1 | ✓ | ✓ | | | | | | |
| | 2 | ✓ | ✓ | | | | | | |
| | 3 | ✓ | ✓ | | | | | | |
| | 4 | ✓ | ✓ | | | | | | |
| | 5 | ✓ | ✓ | | | | | | |
| | 6 | ✓ | ✓ | | | | | | |
| | 7 | ✓ | ✓ | | | | | | |
| | 8 | ✓ | ✓ | | | | | | |
| | 9 | ✓ | ✓ | | | | | | |
| | 10 | ✓ | ✓ | | | | | | |
| | 11 | ✓ | ✓ | | | | | | |
| | 12 | ✓ | ✓ | | | | | | |
| | 13 | ✓ | ✓ | | | | | | |
| | 14 | ✓ | ✓ | | | | | | |
| | 15 | ✓ | ✓ | | | | | | |
| | 16 | ✓ | ✓ | | | | | | |
| | 17 | ✓ | ✓ | | | | | | |
| | 18 | ✓ | ✓ | | | | | | |
| | 19 | ✓ | ✓ | | | | | | |
| | 20 | ✓ | ✓ | | | | | | |

80.     Significantly, the MoMI-018 patent was unpublished at the time Microsoft submitted its patent application for PMP.  MRT filed an application for the MoMI-018 patent on February 3, 2004, and that application was subsequently published on August 4, 2005.  Yet Microsoft filed its PMP patent application on April 27, 2005 – more than three months prior to the publication of MRT's MoMI-018 patent.  Microsoft could have had access to the information disclosed in MRT's MoMI-018 patent application only by misappropriating MRT's trade secrets disclosed by Crowell in late 2003.  Microsoft knew what it could not have known without access to MRT's trade secrets, before it could have known it through other means.  Below is an overview of the history of the two patent applications:

|  | MRT '095 Patent (MRT '031 Application) | Microsoft '481 Patent (Microsoft '689 Application) |
|---|---|---|
| App # | 10/772,031 | 11/116,689 |
| Patent # | 7,802,095 | 9,363,481 |
| Filed: | 2/3/2004 | 4/27/2005 |
| Claimed priority: |  | 4/22/2005 |
| Awarded priority: | 2/3/2004 | 4/27/2005 |
| Earliest pub date: | 8/4/2005 | 11/02/2006 |

81.     The table below summarizes the Patent Examiner's rejection of Microsoft's patent claims and maps Microsoft patent claims onto the copyrighted textual and diagrammatic descriptions included in various paragraphs in MRT's patent (an unpublished trade secret at the time of Microsoft's patent application), according to the paragraph numbers cited by the examiner.

**USPTO Patent Rejection Table - Microsoft PMP Patent Application No. 11/116,689**
**Rejection Dated: 10/24/2008**

| Microsoft Claim # | Microsoft Incorporated Claim | US20050172121A1 Reference Location |
|---|---|---|
| 1 | | A, P0068, P0220, P0111, P0037 |
| 2 | 1 | P0067 |
| 3 | 1 | P0220 |
| 4 | 1 | P0257 |
| 5 | 1 | P0046 |
| 6 | 1 | P0053 |
| 7 | 1 | P0053 |
| 8 | 1 | P0083 |
| 9 | | P0101, 0278 |
| 10 | 9 | P0087 |
| 11 | 9 | P0101 |
| 12 | 9 | P0098 |
| 13 | 9 | P0278 |
| 14 | | P0093, P0088, P0083, P0335, P0149 |
| 15 | 14 | P0248 |
| 16 | 14 | P0317 |
| 17 | 14 | P0335 |
| 18 | 14 | P0337 |
| 19 | 14 | P0298 |
| 20 | 1 | P0295 |

Legend:
(for Risan Reference Locations)

A Refers to the Abstract
P Prefaces the Paragraph Number

82.    The Patent Examiner's analysis of the MoMI-018 Content Delivery Network ("CDN") provides direct evidence of Microsoft's copying of MoMI-018 trade secrets.  The CDN was the world's first copyrighted architectural design plan for a secure networked streaming environment, now known as the "Secure Cloud," using the CDP source code to secure the media. Microsoft copied over 14 of MoMI-018 detailed diagrams in a strikingly similar manner.

83.    Diagram FIG. 8. (below), a descriptive diagram for the Secure Cloud, appears in MoMI-018 and was created by MRT in mid-2003.  MRT launched its Secure Cloud in November 2003 with BlueBeat.com. FIG. 8 even discloses the actual equipment and software components used to power the Secure Cloud.



FIGURE 8

84.    The component reference numbers in FIG. 8 above correspond with detailed instructions, additional diagrams, and source code, which are comprised of hundreds of paragraphs and thousands of words in MoMI-018.

85.    The Patent Examiner's decision regarding claim 16 of MoMI-018, which describes the architecture of the Secure Cloud, rejects Microsoft's PMP Cloud disclosure as a brazen copy of MRT's Secure Cloud:

In regard to *claim 16*, claim 14 is incorporated and Risan discloses:

-    further comprising a digital rights management system communicating with the protected media pipeline (Risan, paragraph [0317], "Accordingly administrative node 1770 can, in one embodiment, be configured to provide management functionalities to a network, (e.g., network 1700 or network 800 of FIG. 8).  Types of management functionalities that can be provided by administrative node 1770 can include, but is not limited to, network management,

user management, encryption and decryption key management, authorization management media management, transaction management, player application management, and cache management.  Administrative node 1770 can also be implemented as a source node 1715 and/or as a media delivery point as described herein with reference to FIG. 8").

86.    A side-by-side comparison of MRT's Secure Cloud configuration and the corresponding portion of Microsoft's PMP patent application confirms Microsoft's copying. Compare MRT's MoMI-018 diagram (FIG. 5D, below right, as described in claim 1) with Microsoft's diagram (FIG. 6, below left).  FIG 5D provides a complete roadmap for securing media content transmitted from the Cloud to a user's computer with detailed descriptions, diagrams and declaring source code embodiments.



87.    The red arrows show where Microsoft clumsily copied key elements from MoMI-018.  Microsoft attempted to obfuscate its copying, but the Microsoft copied diagram FIG 6 is strikingly similar to MoMI-018 trade secret FIG 5D, as the Patent Examiner noted.  Microsoft published FIG. 6 at the WinHec 05 on April 27, 2005 technology conference, and again a year later at WinHec 06.  In 2005, all of the materials of MoMI-018 were a trade secret when misappropriated.

88.     The components within FIG 5D were copied as well.  For example,  Microsoft copied both MRT's secure codec 303 (also known as coder/decoder 303), which is a component of CCM 300 (on the upper right of FIG 5D), and its disclosed **declaring code.**   MRT's coder/decoder was copied by Microsoft beginning with paragraph [0067] of MoMI-018, followed by 21 detailed paragraphs, including two source code disclosures and multiple diagrams, as the USPTO Patent Examiner's decision discussed:

> "In regard to claim 2, claim 1 is incorporated and Risan discloses:
> "- *wherein one of the transform mechanisms of the plurality of transform mechanisms is a decoder* (Risan, paragraph [0067], "Still referring to FIG. 3, copyright compliance mechanism 300 further includes a coder /decoder 303')":

The coder/decoder 303 is an example of a stolen trade secret and is identified along with other misappropriated trade secrets in Exhibit A to this complaint.

89.     The Coder/decoder  303  is  expressed  in  software  to  securely  perform **encoding/decoding** of media files, **compressing/decompressing** of media files, and **detecting** that delivered files are properly encrypted within a secure pathway. From introductory paragraph [0067] on how to build a coder/decoder 303 from MoMI-018, the Patent Examiner observed:

> "Still referring to FIG. 3, copyright compliance mechanism 300 further includes a coder/decoder (codec) 303 that, in one embodiment, is adapted to perform, but is not limited to, encoding/decoding of media files, compressing/decompressing of media files, and detecting that delivered media files are encrypted as prescribed by CCM 300."

90.     The coder/decoder 303 software, in the form of a secure networked media driver, was inserted into the Microsoft OS stack (center of FIG 5D) by MRT, where the CDP redirected media files into a controlled data pathway such as a Netflix movie to coder/decoder 303 in order to perform the movie securely.  Paragraphs [0074] and [0078] in MoMI-018 provide software expression exemplars to embody coder/decoder 303.  These declaring code software exemplars were copied by Microsoft.

91.    The declaring source code for the coder/decoder in MoMI-018  express key elements of the CDP; one source code exemplar was provided in MoMI-018 paragraph [0077], so the CDP using CCM 300 can be created within **any media player application within a computer operating system connected to the Cloud.**  The source code expression described below will hook into and work on **any** operating system as is described at the end of MoMI-018 paragraph [0077]:

> "The following C++ source code is an exemplary implementation of a portion of a codec 303 and/or a custom media device driver 307 for diverting and/or redirecting certain data pathways that are commonly used for recording of media content, in accordance with an embodiment of the present invention:

```
[0077] DWORD
_stdcall
widMessage(UINT      uDevId,
    UINT        uMsg,
    DWORD    dwUser,
    DWORD    dwParam1,
    DWORD    dwParam2)
{
BOOL bSkip;  /* flag indicating operation to be
skipped */
HWND          hWndMon;  /* handle to main window
      for monitor */
DWORD          dwRetVal;  /* return value for
      operation */
/* initialize variables */
bSkip  = FALSE;
dwRetVal = (DWORD) MMSYSERR_NOTSUPPORTED;
if (uMsg == WIDM_START)
{
/* attempt to locate window for monitor application */
if ( (hWndMon = FindMonitorWindow( ))
   != (HWND) 0)
{
/* obtain setting for driver */
bDrvEnabled = ( SendMessage(hWndMon,
uiRegMsg,
0,
0)
== 0)
```

```
? FALSE : TRUE;
}
if (bDrvEnabled == TRUE)
{
/* indicate error in operation */
dwRetVal = MMSYSERR_NOMEM;
/* indicate operation to be skipped */
bSkip = TRUE;
}
}
if (bSkip == FALSE)
{
/* invoke entry point for original driver */
dwRetVal = CallWidMessage(uDevId, uMsg, dwUser,
dwParam1,
dwParam2);
}
/* return to caller */
return dwRetVal;
}"
```

"It is noted that when properly configured, system hook **305** can govern nearly any function or property within nearly any media player application that may be operational within a client computer system, (e.g., **210**). In one embodiment, system hook **305** is a DLL (dynamic link library) file. It is further noted that system hooks are well known in the art, and are a standard facility in a Microsoft Windows™ operating environment, and accordingly can be implemented in a variety of ways. However, it is also noted that system hook **305** can be readily adapted for implementation in alternative operating systems, e.g., Apple™ operating systems, Sun Solaris™ operating systems, Linux operating systems, and nearly any other operating system."

92.     The copied code first appeared in Windows Vista in 2007 and has been in Windows ever since.

93.     In 2009 and 2010, Microsoft amended its patent claims and tried again.  In May 2010, the USPTO again rejected Microsoft's application because the amended claims still read on the prior art, including MRT prior art.

94.     In 2012, Microsoft tried ***again*** and failed to obtain its patent, once more because the prior art already disclosed the invention to a person skilled in the art.

95. Thus, the USPTO repeatedly recognized that the supposed PMP invention was a virtual copy of MRT's CDP.

## COUNT I—INFRINGEMENT OF COPYRIGHT (17 U.S.C. § 501 *ET SEQ.*)

96. MRT realleges the foregoing paragraphs as if fully set forth herein.

97. MRT owns and has registered the copyrights for the code behind the MRT Software, including the CDP, X1RC software, the BBSP, the BBSP for WMP Software, and the BBSP for Vista Software. MRT holds the exclusive right to reproduce, to create derivative works of, and to distribute the MRT Software.

98. The CDP source code was created in 2002. The copyright was initially registered as TX0007580669 on September 20, 2012, and supplemented on October 15, 2012 (TX0006604611) and August 23, 2013 (TX0006484665).

99. The IsRecorderPresent software was created in 2002 and is unpublished. The copyright was registered as TX0007714608 on July 31, 2013.

100. The BBSP software was created in 2004, and the copyright was registered as TXU001892246 on April 16, 2014.

101. The X1RC software was created in 2003, and the copyright was registered as TXU002101909 on April 6, 2017.

102. The BBSP software (later version) was created in 2006, and the copyright was registered as TXU002080138 on April 6, 2017.

103. The BBSP for WMP software was created in 2006, and the copyright was registered as TXU002101908 on April 6, 2017.

104. The BBSP for Vista Including X1 Kernel Component software was created in 2009, and the copyright was registered as TXU002080140 on April 6, 2017.

105.    "Securex1 and 9 Other Unpublished Works" were created in 2006, and the copyright was registered as TXU002223706 on October 23, 2020.  This is the Build Computer registration.

106.    "Controlling Interaction of Deliverable Electronic Media" was created in 2003 and published on May 27, 2004.  The copyright was registered as TX0009094163 on March 12, 2022.

107.    "Method and System for Controlling Video Media" was created in 2003 and published on April 14, 2005.  The copyright was registered as TX0009094165 on March 12, 2022.

108.    "Method and System for Preventing Unauthorized Recording of Media Content in an iTunes TM Environment" was created in 2004 and published on August 4, 2005.  The copyright was registered as TX0009094179 on March 12, 2022.

109.    "Method and System for Preventing Unauthorized Recording of Media Content on a Macintosh Operating System" was created in 2004 and published on August 4, 2005.  The copyright was registered as TX0009094171 on March 12, 2022.

110.    "Method for Redirecting of Kernel Data Path for Controlling Recording of Media" was created in 2014 and published on October 1, 2015.  The copyright was registered as TX0009094287 on March 12, 2022.

111.    "Preventing Unauthorized Distribution of Media Content within a Global Network" was created in 2003 and published on March 17, 2005.  The copyright was registered as TX0009168277 on September 9, 2022.

112.    Microsoft is directly liable for copyright infringement by willfully creating, publishing, reproducing, and distributing and performing the unpublished MRT Software. PMP and all of Microsoft's products using PMP contain a copy of, or derivative work of, the MRT Software suite.  Microsoft's infringing products range from media players to operating systems

(Windows Vista, Windows 7, Windows 8, Windows 10, and Windows 11, Windows N and IE and Edge browsers).  The offending Microsoft code is embedded in virtually every Microsoft product, including the Azure Intelligent Cloud, PlayReady, Xbox, and Office 365.

113.    Microsoft had a motive to copy the MRT Software due to its inability to create the software on its own and the prospect of liability to media creators whose works were not protected by Microsoft.  Microsoft's attempts to acquire the technology through legitimate means (e.g., purchase) failed, increasing its motive for acquiring the software through illegal means including, but not limited to, misappropriation and copying, especially since it had failed to acquire MRT without breaching the HSR limit.

114.    Microsoft had several opportunities to copy the source and/or object code for the MRT Software, including through Crowell's theft of intellectual property from MRT, examination under the 2004 NDA, access through the 2006 demonstration to DiMA, violation of the 2012 NDA, and misuse of the 2012 data room set up for the potential patent portfolio acquisition.

115.    Microsoft's copying is evident because of the presence of the Fingerprint and the 100 percent SSO code match in the software containing its PMP code, including but not limited to the Original Infringing Products.

116.    Microsoft's copying is evident in the USPTO's two-time rejection of its PMP patent for obvious duplication of the specifications, diagrams, and claims of MRT's '033 SeCure Cloud Patent.

117.    Microsoft's copying is also evident in the nearly identical SSO of PMP in comparison to MRT's CDP.

118.    Microsoft successfully obfuscated its copyright infringement with Warbird, which constitutes fraudulent concealment and tolls any applicable statute of limitations.

119.    But the public release in 2019 of GHIDRA software by the NSA allowed MRT experts to reverse engineer some—but still not all—of Microsoft's PMP code.  In the code that was reverse engineered, the SSO of the PMP code had a 100% match to MRT's copyrighted CDP code and also revealed the distinctive Fingerprint.  The code surrounding the Watermark is still hidden by the Warbird Obfuscator in the GHIDRA analysis.

120.    Microsoft's copying has damaged MRT by depriving it of the ability to market its own DRM technology.  MRT was engaged in many discussions to license its technology, under NDAs with companies such as IBM, Intel, Nokia, Hewlett Packard, and Phillips, but Microsoft's infringement caused the market for licensing to dry up.  Microsoft's infringement has caused the RIAA and other content providers to lose all interest in MRT's X1RC technology.

121.    Microsoft continues to infringe MRT's copyrights with every publication of its infringing products.

122.    In addition, on information and belief, Microsoft has created derivative works of the infringing products, which also infringe on MRT's copyrights ("Derivative Infringing Products" and, together with the Original Infringing Products, the "Microsoft Infringing Products").

123.    Microsoft is also liable for contributory copyright infringement.  Microsoft induces customers to commit infringement by persuading and encouraging some customers to distribute, and other customers to license, Windows and PlayReady via marketing and sales activities and global licensing patents.  Microsoft contributes to the infringement by knowingly providing components inside Windows and PlayReady that are primarily intended to be used in an infringing way.  PlayReady has over 1,000 distributors.

124.    Microsoft's infringement of MRT's copyrights is deliberate, willful, and in disregard of MRT's rights, and is being committed for ongoing commercial gain.  Microsoft's willfulness is evidenced by its refusal to act expeditiously to remove or disable MRT's copyrighted code.

125.    MRT's claim for infringement accrues with each and every publication and update of a copyrighted work.

126.    MRT has been and continues to be injured by Microsoft's ongoing infringement of its registered copyrights.

127.    Microsoft's infringement is not fair use.  MRT's work, and Microsoft's use of that work, is clearly commercial.  Copying MRT's code is unnecessary to perform the core functions of Digital Rights Management.  Moreover, Microsoft's copying is substantial, and its incorporation of MRT's code into Windows has effectively destroyed the market for MRT's work.  Furthermore, MRT's code was unpublished.  Accordingly, Microsoft's infringement cannot qualify as fair use.

128.    MRT is entitled to the actual damages it has suffered from Microsoft's continuing infringement of its copyrights, as well as to the profits attributable to the distribution or sale of the Microsoft Infringing Products, in an amount to be proved at trial.

129.    The harm to MRT has been irreparable and will continue unless restrained by this Court.  MRT does not have an adequate remedy at law to prevent a giant software company from publishing illicitly copied code.  MRT is therefore also entitled to injunctive relief restraining Microsoft and all of its employees, officers, agents, and all persons acting in concert from continuing to infringe on MRT's copyrights by reproducing or distributing the Microsoft Infringing Products, and from creating further works derivative of those copyrighted materials.

130.    Moreover, MRT's software code was and still is unpublished.  Microsoft's use and publication of that code violates MRT's right not to speak under the First Amendment.  MRT is therefore entitled to an injunction halting further use or licensing of Microsoft's PMP patent and software.

131.    MRT is also entitled to recover attorneys' fees and costs pursuant to 17 U.S.C. § 505.

## COUNT II—CIRCUMVENTION OF COPYRIGHT PROTECTIONS
### (17 U.S.C. § 1201)

132.    MRT realleges the foregoing paragraphs as if fully set forth herein.

133.    Microsoft circumvented technological measures that effectively controlled access to works in which MRT held a copyright, the MRT Software.  Those measures included but were not limited to distinctive protections such as patented and copyrighted multiple layered encryption and strong passwords.

134.    All of the MRT Software contained provisions in its licenses that prohibited reverse-engineering or decompiling the source code.  The 2004 NDA also included a specific prohibition on reverse-engineering and decompiling.

135.    In addition, the data room set up in 2012 for Microsoft to evaluate the Risan Patent Family contained effective technological measures to control access to the copyrighted components of the MRT Software and various trade secrets.  Microsoft signed an NDA to obtain the password to the secure data room.

136.    Microsoft circumvented MRT's own technological measures in misappropriating its copyrighted works.  All of the MRT Software contained provisions in its licenses that prohibited reverse-engineering or decompiling the source code.  The 2004 NDA also included a specific prohibition on reverse-engineering and decompiling.

137.    Microsoft circumvented MRT's technological measures by reverse-engineering the MRT Software—by "descrambling" the necessary object code or copying source code or other embodiments of the MRT Software.  Microsoft also obtained encrypted software and passwords from Liz Crowell to enable it to circumvent the technological measures adopted by MRT for its source code and Build Computer data.

138.    Microsoft's reverse engineering is not protected by 17 U.S.C. § 1201(f) because Microsoft did not obtain access to the MRT Software legally, and the reverse engineering was not for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs. When Microsoft did obtain access to MRT Software through legitimate means (e.g., the 2004 NDA), reverse-engineering was specifically prohibited.

139.    Microsoft's circumvention of the controls is evident from the presence of MRT's Fingerprint in Microsoft's code.  The presence of the distinctive Fingerprint pattern cannot be dictated by efficiency or external factors, nor was it part of the public domain.  The presence of the Fingerprint in Microsoft's code is inexplicable unless Microsoft stole MRT's source code or portions of MRT's code were reverse-engineered and used.

140.    Microsoft circumvented MRT's technological measures in order to gain access to the copyrighted code, which allowed Microsoft to develop the Microsoft Infringing Products.

141.    Microsoft has committed further violations of Section 1201 because the relevant versions of Microsoft Windows include misappropriated MRT Software, and Windows is therefore a derivative work, a combination of the labor of two different copyright owners.  Only one of the owners (Microsoft) has given permission to access the work.  MRT has not.

142.     Due to Microsoft's wrongful conduct, Microsoft's own technological copyright protections are circumvented whenever media is actually played and whenever audio-visual works are viewed or heard.  Every time a Microsoft operating system or Azure Media Services user logs in to listen to Spotify, watch a Netflix movie, or otherwise view audiovisual content, a Microsoft technological copyright protection measure is deactivated by Microsoft without the approval of MRT, and the unauthorized user is granted access to Microsoft's derivative work containing MRT's unpublished copyrighted code.

143.     For example, when a user wishes to stream protected content on a Microsoft Edge Browser on the Windows Operating System (such as by watching a movie on Amazon Prime or listening to music on Spotify), a PlayReady session is started with a request to stream content.  The rights to stream the content are governed by the streaming serving contract.  The license keys are exchanged by Microsoft using PlayReady License servers and the streaming service, giving the user permission to stream content.  The Microsoft PMP Policy Engine regulates the permissions to stream the content.  Microsoft then uses the license keys transmitted from the PlayReady License servers to start a viewing session.  The keys are used to trigger Warbird decryption of the content protection mechanisms inside the module MFPMP.EXE (an SSO copy of MRT CDP copyrighted code), which resides inside the Windows Operating System Kernel.  MFPMP.EXE code inside the Windows OS Kernel is then decrypted and sent to the Edge browser and used to protect the streamed media content.  The decryption is a circumvention of a technological measure that Microsoft added to the derivative work it created with the MRT CDP.

144.     In addition, Microsoft transmits the license keys over the Internet from the Windows PlayReady server to the client computer, in violation of Section 1201(b)(1), which prohibits "traffic[king]" in "any technology, product, service, component, or part thereof" that is

primarily designed or produced for the purpose of circumventing protection afforded by a technology measure to copyright owners. The PlayReady license server is a component dedicated to delivering the licenses to the client computer so that the MRT code can be unlocked in the Microsoft kernel and sent to the Edge browser to protect the media content.

145.    Further, once decrypted, an unauthorized copy of the derivative work of the CDP code is made and stored in temporary memory for the duration of the streaming session (non-transitory), in violation of Section 1201(a)(1) and 1201(b)(1), and the exclusive rights of MRT, its copyright owner.

146.    In addition, the use of any password granting access to Windows clients and PlayReady based servers constitutes a circumvention under 17 U.S.C. § 1201. When a user logs in to the Windows Operating System, for example, Microsoft circumvents the protection of the password, which is a technological measure to the operating system regulating access to protected works. When a user logs on and gives Microsoft the password, Microsoft uses that password to unlock the operating system for general use. Because Windows is a derivative work that contains MRT's copyrighted property, Microsoft's unlocking of the Operating System constitutes another violation of Section 1201. The primary function of the password unlock is to circumvent a technological measure that protects the right to control copies of derivative works. The unlock mechanism initiates copying of portions of Windows (a derivative work) from the computer's hard drive into the computer's temporary memory (non-transitory) for access by the user. The copy is maintained in memory until the user logs out. The password login circumvention described above, also grants access to Microsoft's Browner, either Edge or Internet Explorer. The browser contains a portion of MRT's Declaring Code, which is used to initiate a request to access media from a PlayReady source.

147.    Users, once knowing, will be engaging in circumvention every time they log into Windows.  Once on notice, all Windows users will be engaging in circumvention and all Windows purveyors will be engaging in trafficking in false copyright management information.  The only way to protect the victims of induced and/or contributory infringement would be to grant takedown relief against Microsoft.

148.    Microsoft updates to the Operating System trigger additional violations of Section 1201.  Microsoft issues periodic updates of the Operating System.  Each new update represents a new copy of a new derivative work.  Users typically specify that updates occur automatically in the background, over the Internet.  A user must be logged into the computer for an update to occur.  Once an update has occurred in the background, the user is instructed to reboot the computer, which requires a password login.  Once again, Microsoft takes the password key and unlocks Windows access without permission of MRT, the second copyright owner.  Another violation of Section 1201 occurs as a new derivative work (copy) is distributed to the user for access.  Such updates can occur as often as every two weeks.

149.    MRT has been and continues to be injured by Microsoft's circumvention of MRT's technological means for protection of access to its copyrighted work.

150.    Moreover, MRT's software code was and still is unpublished.  Microsoft grants access to MRT's unpublished software code via the circumvention of technological measures every time license keys are exchanged, which violates MRT's right not to speak under the First Amendment.  MRT is therefore entitled to an injunction halting further use or licensing of Microsoft's PMP patent and software.

151.    MRT is entitled to statutory damages and the actual damages it has suffered from Microsoft's continuing circumvention of its protective technological measures, as well as to the

profits attributable to the distribution or sale of the Microsoft Infringing Products, in an amount to be proved at trial.

152.    MRT is also entitled to recover attorneys' fees and costs pursuant to 17 U.S.C. § 505.

## COUNT III—ALTERATION OF COPYRIGHT MANAGEMENT INFORMATION (17 U.S.C. § 1202)

153.    MRT realleges the foregoing paragraphs as if fully set forth herein.

154.    MRT included several forms of copyright management information ("CMI") as part of the MRT Software. The CMI included but was not limited to: the title of the code, notice of authorship, terms and conditions for use of the code, and other distinctive information such as the Fingerprint.

155.    Microsoft's false CMI (giving MRT no attribution) includes:



| Windows specifications | |
|---|---|
| Edition | Windows 11 Pro |
| Version | 23H2 |
| Installed on | 5/22/2024 |
| OS build | 22631.4460 |
| Experience | Windows Feature Experience Pack 1000.22700.1047.0 |
| Microsoft Services Agreement | |
| Microsoft Software License Terms | |

156.    Microsoft knowingly and with the intent to enable or conceal infringement of MRT's copyrights, provided false CMI to consumers by claiming its own copyright on MRT's Software code and thereby also distributed false CMI.

157.    Microsoft further altered MRT's CMI by obfuscating its PMP code, copied from MRT's CDP code, with Warbird without MRT's authority or consent, and then distributing the

altered CMI to consumers on billions of Windows operating systems, knowing that such actions would enable and conceal its own ongoing infringement of MRT's copyrights.

158.    Microsoft's alteration of MRT's copyrighted code through Warbird's obfuscation became evident only after GHIDRA permitted discovery of MRT's Fingerprint behind the concealment and the use of the Warbird Obfuscator.

159.    MRT has been and continues to be injured by Microsoft's distribution of altered CMI under its own mark.

160.    Microsoft also removed CMI from MRT's copyrighted MoMI-018 patent and replaced it with false CMI on its PMP patent.  The copyright office considers the copyrighted material in a patent an unpublished work (17 U.S.C. §1 202(a)(1) discusses only removal, not distribution. which is discussed in subsection (a)(2)).

161.    MRT is entitled to statutory damages and the actual damages it has suffered from Microsoft's alteration of MRT's CMI, as well as to the profits attributable to the distribution or sale of the Microsoft Infringing Products, in an amount to be proved at trial.

162.    MRT is also entitled to recover attorneys' fees and costs pursuant to 17 U.S.C. § 505.

### <u>COUNT IV—TRAFFICKING IN ILLICIT LABELS (18 U.S.C. § 2318)</u>

163.    MRT realleges the foregoing paragraphs as if fully set forth herein.

164.    MRT is the copyright owner for the MRT Software that Microsoft copied and distributed.

165.    By distributing its copied PMP code in both Original and Derivative Infringing Products for the purposes of commercial advantage and private financial gain, Microsoft has knowingly trafficked in a counterfeit or illicit labels accompanying a copy of a computer program, and knowingly distributed counterfeit documentation.

166.    The presence of anti-reverse-engineering and anti-decompilation wording in both the 2004 NDA and various agreements under which Microsoft used MRT Software put Microsoft on notice that distributing the software with any mark other than MRT's would be counterfeit— i.e., Microsoft's distribution of the counterfeit mark was knowing and willful.

167.    MRT is permitted to enforce 18 U.S.C. § 2318 through a civil suit. 18 U.S.C. § 2318(e).

168.    MRT has been and continues to be injured by Microsoft's ongoing trafficking in illicit or counterfeit labels.

169.    MRT is entitled to statutory damages and the actual damages it has suffered from Microsoft's trafficking in illicit labels, as well as to the profits attributable to the distribution or sale of the Microsoft Infringing Products, in an amount to be proved at trial.  MRT reserves the right to claim statutory damages under 18 U.S.C. § 2318(e)(4).

170.    The harm to MRT has been irreparable and will continue unless restrained by this Court.  MRT does not have an adequate remedy at law to prevent Microsoft from distributing counterfeit code.  Pursuant to 18 U.S.C. § 2318(e)(2)(A), MRT is therefore also entitled to injunctive relief restraining Microsoft and all of its employees, officers, agents, and all persons acting in concert from continuing to infringe on MRT's copyrights by reproducing or distributing the Microsoft Infringing Products, and from creating further works derivative of those copyrighted materials.

171.    Pursuant to 18 U.S.C. § 2318(e)(2)(B), MRT also requests that this Court authorize the impounding of all copies of Microsoft Infringing Products in Microsoft's possession.

172.    MRT is also entitled to recover attorneys' fees and costs pursuant to 18 U.S.C. § 2318(e)(2)(C)(i).

## COUNT V—THEFT OF TRADE SECRETS
### (18 U.S.C. § 1832, STATE LAW)

173.    MRT realleges the foregoing paragraphs as if fully set forth herein.

174.    The unpublished MoMI-018/'033 Patent application, which included the full specifications, detailed drawings, diagrams, charts, and embodiments, was an MRT trade secret, as were the technology underlying the MoMI-018/'033 Patent application and the related MoMI-018 embodiment source code, which was never publicly disclosed, even in the patent application. MRT kept the unpublished MoMI-018/'033 Patent and the source code, including the structure, sequence, and organization of that code, as a trade secret.  MRT's trade secrets have significant economic value.

175.    MRT's trade secrets were trade secrets at the time they were misappropriated by Microsoft.  Microsoft misappropriated the trade secrets reflected in the MoMI-018/'033 Patent before it was ultimately published and granted by the USPTO.  Moreover, the software relating to the Patent was never published.  MRT's patent copyrights were registered as unpublished works.

176.    The unpublished MoMI-018/'033 Patent and the source code derived independent economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use and was the subject of efforts that were reasonable under the circumstances to maintain its secrecy.

177.    MRT's confidential, propriety, and trade secret information relates to products and services used, sold, or ordered in, or intended to be used, sold, or ordered in, interstate or foreign commerce.  Microsoft has used and is continuing to use MRT's trade secrets to generate business from customers located in this District, throughout the United States, and indeed all over the world.

178.    MRT maintained the confidentiality of its trade secrets.  It required employees to maintain the confidentiality of its trade secrets.  It kept its trade secret binders in a single notebook

stored in a desk drawer in a locked room to which only one person held a key. Secret source code was kept on the password-protected Build Computer to which only three people legitimately had access. Unpublished and undisclosed patents were kept in a file cabinet to which only one person possessed a key. The locked file cabinet also held materials relating to patent claims, source code enablement and embodiments, and source code passwords. The patent copyrights remain unpublished.

179.    Microsoft acquired the trade secrets expressed in the unpublished MoMI-018/'033 Patent application and its source code through means Microsoft knew to be improper, including accepting material stolen from MRT's offices, violating the terms of the 2004 NDA, and misusing the information from the 2012 data room and violating the 2012 NDA. Microsoft also reverse-engineered or decompiled the code to obtain the trade secret source code improperly, in violation of the 2004 NDA. All of these actions were knowing, willful, and malicious—Microsoft could not acquire the trade secrets through legitimate means, such as offering a fair price for them, and instead resorted to theft.

180.    All of MRT's trade secrets were intended for use in interstate and foreign commerce, and all of the Microsoft Infringing Products are trafficked in interstate and foreign commerce.

181.    MRT is permitted to enforce 18 U.S.C. § 1832 through a civil action. 18 U.S.C. § 1836(b)(1).

182.    No officer of MRT discovered the misappropriation of the unpublished MoMI-018/'033 Patent application and its source code until less than three years prior to the filing of this action.

183.    MRT has been and continues to be injured by Microsoft's theft of its trade secrets. As a direct consequence of the theft, MRT has been deprived of the opportunity to license or sell its technology to Microsoft and others.

184.    In addition, Microsoft has been unjustly enriched, in amounts according to proof at trial.  Microsoft used MRT's trade secrets to successfully market and sell its own products and services.

185.    MRT is entitled to the actual damages it has suffered from Microsoft's theft of its trade secrets, as well as to the unjust enrichment attributable to the distribution or sale of the Microsoft Infringing Products, in an amount to be proved at trial.

186.    MRT is entitled to exemplary damages because the trade secrets were willfully and maliciously misappropriated.

187.    The harm to MRT has been irreparable and will continue unless restrained by this Court.  MRT does not have an adequate remedy at law to prevent a giant software company from distributing MRT's trade secrets.  Pursuant to 18 U.S.C. § 1836(b)(2), MRT alleges that the extraordinary circumstances exist to warrant issuing an order of civil seizure.  A company on the scale of Microsoft could easily evade an injunction prohibiting sale of the trade secret material, simply accepting mounting fines, unless the Microsoft Infringing Products are placed under a seizure order.  Through its control over its own operating systems, even on remote computers, Microsoft has constructive possession of the trade secret code illicitly hidden in its PMP software.  Years after its misappropriation, Microsoft has no legitimate interest in using trade secret code that it knows it has been misappropriated and should be able by now to engineer a solution sufficient to mitigate the harm of such an order, such as by disabling the use of PMP through an automatic update pushed to versions of Microsoft operating systems.

188.    MRT is also entitled to recover attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3)(D).

## COUNT VI—VIOLATION OF UNFAIR COMPETITION LAW
## (STATE LAW)

189.    MRT realleges the foregoing paragraphs as if fully set forth herein.

190.    Microsoft committed, and continues to commit, unlawful, unfair, and fraudulent business acts by passing off its PMP software as if it were its own, rather than CDP, the intellectual property of MRT.

191.    Microsoft used, and continues to use, unfair, deceptive, and untrue advertising to deceive the public into believing that the intellectual property was properly Microsoft's to distribute, thereby also denigrating MRT's intellectual property.

192.    MRT has been and continues to be injured by Microsoft's ongoing unfair business practices and untrue advertising.  The unfair and deceptive practices and advertising caused and continue to cause such harm.

193.    The foregoing allegations demonstrate the illegality of Microsoft's actions under both federal and applicable state law and the unlawful means it has used to oppress a vastly smaller competitor.

194.    MRT is entitled to the actual damages it has suffered from Microsoft's ongoing use of unlawful, unfair, and deceptive trade practices and advertising, as well as to the profits attributable to the distribution or sale of the Microsoft Infringing Products, in an amount to be proved at trial.

195.    The harm to MRT has been irreparable, and will continue unless restrained by this Court.  MRT does not have an adequate remedy at law to prevent a giant software company from using unlawful and unfair means of competition. MRT is therefore also entitled to injunctive relief

restraining Microsoft and all of its employees, officers, agents, and all persons acting in concert from continuing to reproduce or distribute the Microsoft Infringing Products, and from creating further works derivative of those copyrighted materials.

196.    MRT is also entitled to recover attorneys' fees and costs.

## COUNT VII—VIOLATION OF DMCA TAKEDOWN ORDER
## (17 U.S.C. § 512)

197.    MRT realleges the foregoing paragraphs as if fully set forth herein.

198.    On December 9, 2024, MRT notified Microsoft of its violation of MRT's copyrights pursuant to 17 U.S.C. § 512.

199.    The notice, attached as Exhibit B, notifies Microsoft of its infringing activities under 17 U.S.C. § 512(c)(3).

200.    The requested takedown would not harm consumers.  TV viewers would not be impacted.  They would still be able to stream media content on devices including Smart TVs using Google's Widevine and Apple Fairplay.  Widevine is a Digital Rights Management (DRM) technology that is used by streaming services, such as Amazon, Netflix, Disney+, and Hulu and Spotify.

201.    FairPlay DRM is used exclusively by Apple to protect digital content across their entire ecosystem, including iPhones, iPads, Apple TVs, and Mac computers, essentially meaning that content providers delivering content to Apple devices utilize FairPlay DRM exclusively to secure their streaming videos, music, and other digital media on those platforms.

202.    Microsoft Windows PC users would not be impacted.  They would still be able to use Google Chrome or Mozilla Firefox with Widevine to stream content.

203.    Phone users would not be impacted.  Apple phones can use Fairplay to stream content.  Android phones can use Widevine to stream content.

204.    Microsoft Edge browser use is down to five percent of the market.  A takedown from the browser would not affect the streaming of media content.

205.    Windows N in the European Union omits MRT's copyrighted code from the Windows OS for antitrust reasons.  Microsoft's derivative version of MRT's code can be added to EU Windows PC by installing the Windows Media Feature Pack for Windows N.  Microsoft's Policy Engine and MFPMP.exe can be removed from Windows PC's inside the EU and omitted from future updates of the Windows Media Feature Pack.

206.    Microsoft did not act expeditiously to remove or disable the infringing use of PMP and other copyrighted material in its software.

207.    Microsoft derives economic benefit from the continued use of PMP and other copyrighted material in its software.

208.    MRT has been and continues to be injured by Microsoft's refusal to act expeditiously to remove or disable the infringing use of PMP and other copyrighted material in its software.

209.    MRT is entitled to the actual damages it has suffered from Microsoft's continuing infringement of its copyrights, as well as to the profits attributable to the distribution or sale of the Microsoft Infringing Products, in an amount to be proved at trial.

210.    The harm to MRT has been irreparable and will continue unless restrained by this Court.  MRT does not have an adequate remedy at law to prevent Microsoft from publishing illicitly copied code.  MRT is therefore also entitled to injunctive relief restraining Microsoft and all of its employees, officers, agents, and all persons acting in concert from continuing to infringe on MRT's copyrights by reproducing or distributing the Microsoft Infringing Products, and from creating further works derivative of those copyrighted materials.

211.    Moreover, MRT's software code was and still is unpublished.  MRT is therefore entitled to an injunction halting further use or licensing of Microsoft's PMP patent and software.

212.    MRT is also entitled to recover attorneys' fees and costs pursuant to 17 U.S.C. § 505.

## COUNT VIII—DECLARATORY JUDGMENT OF INVALIDITY OF INFRINGING MICROSOFT COPYRIGHTS (28 U.S.C. § 2201)

213.    MRT realleges the foregoing paragraphs as if fully set forth herein.

214.    Microsoft has asserted, and continues to assert, copyright claims over the source code of PMP.  These copyright claims are the basis for the licenses that Microsoft sells for its Infringing Products (both Original and Derivative).

215.    Any copyright Microsoft claims for the source code of PMP is invalid. Microsoft does not own and did not create the PMP source code as an original work.  The PMP source code is therefore uncopyrightable by Microsoft.

216.    An actual controversy exists between MRT and Microsoft regarding the rights in and ownership of the copyrights to the source code embodied in PMP and CDP.

217.    MRT and Microsoft have adverse legal interests regarding their respective rights in and ownership of the copyrights to the source code embodied in PMP and CDP.  The dispute is not hypothetical, but is immediate and real, as prior litigation has demonstrated, and a declaration of the parties' rights with respect to those copyrights would conclusively resolve the conflict.

218.    MRT is entitled to a declaration in accordance with 17 U.S.C. § 411(b) that Microsoft's copyrights in the PMP source code and all of the works and embodiments derived therefrom are invalid, including the following copyrights:

| | Microsoft Windows Registrations, Table Updated 12/5/2024 | |
| | Full Title | Registration Number |
| --- | --- | --- |
| 1 | Windows Vista Ultimate. | TX0006508905 |
| 2 | Windows Server 2008 Enterprise. | TX0006880740 |
| 3 | Windows Small Business Server 2011 Standard. | TX0007526450 |
| 4 | Windows Small Business Server 2011 Essentials. | TX0007526478 |
| 5 | Windows Server 2012. | TX0007622123 |
| 6 | Windows 8. | TX0007601008 |
| 7 | Windows 8.1 Pro. | TX0007740672 |
| 8 | Windows 10 Pro. | TX0008058526 |
| 9 | Windows 10 Anniversary Update. | TX0008241223 |
| 10 | Windows Server 2016 Datacenter. | TX0008420034 |
| 11 | Windows 10 Home. | TX0008454283 |
| 12 | Windows 10 Home (Spring 2018 Update) | TX0008568294 |
| 13 | Windows Server 2019. | TX0008659104 |
| 14 | Windows 10 Pro (Fall 2018 Update) | TX0008733682 |
| 15 | Windows 10 Pro (Spring 2019 Update) | TX0008782357 |
| 16 | Windows 10 (Spring 2020 Update) | TX0008890546 |
| 17 | Windows Server 2022. | TX0009008683 |
| 18 | Windows 10 (Fall 2020 Update) | TX0009044495 |
| 19 | Windows 10 (Fall 2021 Update) | TX0009063572 |
| 20 | Windows Server 2022 Datacenter: Azure Edition. | TX0009072941 |
| 21 | Windows 11. | TX0009110306 |

Note: The plaintiffs could not find registrations for Microsoft Browsers, other than Internet Explorer 9, nor the Azure Stack (which contains Azure RMS) later than 2021.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff asks this Court for judgment for itself and against Defendants, including:

    a.   Actual and statutory damages;

    b.   Profits attributable to Microsoft's infringing use of the copyrighted material;

    c.   Disgorgement of Microsoft's unjust enrichment;

    d.   Exemplary damages;

    e.   An injunction restraining Microsoft from ongoing use of the copyrighted trade-secret code in its PMP program;

    f.   An order impounding all Microsoft Infringing Products in Microsoft's possession;

g.   An order of civil seizure disabling the trade-secret PMP code;

h.   A declaration that Microsoft's infringing copyrights are invalid;

i.   Attorneys' fees and costs; and

j.   Such other and further relief at law or in equity as this Court should find just
     and proper.

### JURY DEMAND

Plaintiffs hereby demand a jury trial as to all claims triable by a jury.


Respectfully submitted,                    Dated this 10th day of December, 2024.

/s/ *Jonathan S. Massey*
Jonathan S. Massey (#457593)
Bret R. Vallacher (#90014327)
Kylie Chiseul Kim (#230277)
Jeremy G. Mallory (#1025814)
Matthew E. Layden (#90025915)
**MASSEY & GAIL LLP**
1000 Maine Avenue SW, Suite 450
Washington, D.C.  20024
Tel:  202-652-4511
Fax: 312-379-0467
jmassey@masseygail.com
bvallacher@masseygail.com
kkim@masseygail.com
jmallory@masseygail.com
mlayden@masseygail.com

*Attorneys for Plaintiffs*